**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2039
_____

B.L.L.,
*Petitioner*

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A205-641-788)
Immigration Judge: Tamar H. Wilson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 6, 2023
_____

Before: SHWARTZ, BIBAS, and AMBRO, <u>Circuit Judges</u>.

(Filed: March 9, 2023)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

SHWARTZ, <u>Circuit Judge</u>.

B.L.L. petitions for review of the Board of Immigration Appeals ("BIA") decision denying her claim for asylum. Because the BIA erred in concluding that B.L.L. waived her claim for humanitarian asylum, and because the BIA misread one of B.L.L.'s proposed particular social groups, we will grant the petition for review and remand to the BIA.

I

B.L.L. grew up in Guatemala with five brothers and one sister. B.L.L.'s father began sexually abusing her daily when she was about five years old and began raping her when she was nine years old. He also beat B.L.L., her mother, and her siblings. Her four older brothers fled their home due to the abuse. Neither B.L.L. nor her mother reported the abuse to the police.

B.L.L.'s father kept her isolated from others, removing her from school when she was nine years old to prevent her from playing with other children. He threatened to burn her if she ever told her mother or anyone else about the abuse. When B.L.L. was eleven or twelve years old, her father left for the United States. Thereafter, B.L.L. met her now-husband and moved in with his family. When her father returned to Guatemala, he threatened to kill B.L.L. and her husband and prevented B.L.L. from visiting her mother. B.L.L.'s husband went to the police once regarding these threats, but later left the country.

2

B.L.L. remained and her father continued to threaten her.[1] She fled to the United States in 2012.

B.L.L. was apprehended by the Department of Homeland Security and removal proceedings were commenced before an Immigration Judge ("IJ").[2] In response, B.L.L. filed, among other things, an application for asylum.[3] B.L.L. claimed that her father's abuse constituted persecution and she feared that her father would "rape, beat, or even kill" her if she returned to Guatemala. She alleged that her persecution was based on her membership in three particular social groups ("PSG"s): (1) "a child viewed as 'property' of her father"; (2) "a child without parental protection"; and (3) "a member of the [L* D*] family."[4] AR 117-19.[5]

---

[1] In her credible fear interview, B.L.L. also stated that when she was eighteen, after her husband left for the United States, her father coerced her to move back in with him, and he resumed raping her. However, this is not mentioned in her affidavit or testimony before the IJ.

[2] B.L.L. was initially charged as inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) but the charge was amended to charge her under 8 U.S.C. § 1182(a)(6)(A)(i).

[3] B.L.L. also applied for withholding of removal and relief under the Convention Against Torture, which were denied, and she does not seek review of those rulings.

[4] To ensure confidentiality, we refer to B.L.L.'s last name as L* D*.

[5] In support of her application, B.L.L. also submitted a psychological evaluation, which concluded that B.L.L. suffers from posttraumatic stress disorder ("PTSD") and depression due to the abuse she faced as a child, both of which are exacerbated when she thinks or hears about Guatemala. B.L.L. also submitted an article on violence against women in Guatemala, which stated that criminal penalties for domestic violence did not exist in Guatemala until 2008 and that the rate of impunity for crimes against women remains very high (approximately 98.1% in 2013). In addition, B.L.L. submitted a 2017 report by the United States Department of State, which stated that the Guatemalan police "often failed to respond to requests for assistance related to domestic violence," AR 185,

At the hearing before the IJ, B.L.L. recounted her father's abuse and testified that he had since died. When asked why she is afraid to return to Guatemala, B.L.L. responded that she is afraid of the gangs and crime.

The IJ concluded that B.L.L.'s testimony was credible but denied her application. Relevant here, the IJ held: (1) B.L.L. had failed to show a nexus between her membership in any of the proposed PSGs and the abuse by her father, instead concluding he targeted her simply because she was "available" to him, AR 53-55 (relying on Matter of A-B-, 27 I. & N. Dec. 316 (A.G. 2018)); (2) because B.L.L.'s father is dead, she could not demonstrate a well-founded fear of future persecution by him, AR 54; and (3) her proposed PSGs of "child viewed as property of father" and "child without parental protection" are not cognizable because they are not socially distinct, AR 54.

B.L.L. appealed, challenging the IJ's findings as to past persecution and asserting that the BIA should remand to the IJ to consider her eligibility for humanitarian asylum under 8 C.F.R. § 1208.13(b)(1)(iii).[6] The BIA dismissed the appeal, concluding: (1)

_____

and that the Public Ministry reported only sixteen convictions out of 2,571 reports of child abuse from January to August 2017.

[6] Humanitarian asylum allows an applicant who has experienced past persecution to obtain asylum "in the absence of a well-founded fear of persecution" if:

> (A) The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or
> (B) The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

8 C.F.R. § 1208.13(b)(1)(iii)(A)-(B).

B.L.L. failed to "meaningfully raise" a humanitarian asylum claim before the IJ and, regardless, she could not establish humanitarian asylum because she had not demonstrated past persecution on account of a protected ground, AR 6, (2) none of B.L.L.'s proposed PSGs were cognizable because (a) the group "[L*D*] family", which the BIA construed to include extended family or in-laws, lacked particularity and social distinction, AR 4, and (b) the proposed groups defined as "child viewed as property of father" and "child without parental protection" failed the particularity and social distinction requirements because "groups[] which are defined by youth are too broad and amorphous," AR 5,[7] and (3) due to her father's death, B.L.L. could not establish a well-founded fear of future persecution.

B.L.L. petitions for review.

## II[8]

B.L.L. seeks humanitarian asylum. Humanitarian asylum is available to a noncitizen who has suffered past persecution[9] and can demonstrate (A) "compelling

---

[7] The BIA noted that the Attorney General had since vacated Matter of A-B- and explained that it was not relying on that case in reaching its decision.

[8] The BIA had jurisdiction pursuant to 8 C.F.R. § 1003.1(b)(3). We have jurisdiction pursuant to 8 U.S.C. § 1252(a). "We review the BIA's legal determinations de novo," Zhi Fei Liao v. Att'y Gen., 910 F.3d 714, 718 (3d Cir. 2018) (quoting Sesay v. Att'y Gen., 787 F.3d 215, 220 (3d Cir. 2015)), and its "factual findings under the substantial evidence standard, which means that they are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," Fei Yan Zhu v. Att'y Gen., 744 F.3d 268, 272 n.3 (3d Cir. 2014).

[9] Past persecution requires that an applicant "suffered persecution in the past in the applicant's country of nationality or . . . country of last habitual residence, on account of

reasons for being unwilling or unable to return to that country arising out of the severity of the past persecution," 8 C.F.R. § 208.13(b)(1)(iii)(A), or (B) "a reasonable possibility that he or she may suffer other serious harm upon removal to that country," 8 C.F.R. §208.13(b)(1)(iii)(B). B.L.L. asserts that she is eligible for humanitarian asylum under subsection (A) of the regulation, which is "based on the severity of past persecution alone" and requires that such persecution be "extreme" or "atrocious." Sheriff v. Att'y Gen., 587 F.3d 584, 593-94 (3d Cir. 2009). The BIA declined to consider B.L.L.'s humanitarian asylum claim because she did not raise it before the IJ, and in any event, concluded that she had not demonstrated persecution on account of a protected ground.

1

We first consider whether a noncitizen waives a claim for humanitarian asylum by failing to specifically request it before the IJ. We have not addressed this question, but two of our sister circuits have held that where a noncitizen seeks asylum based on past persecution, she need not separately request humanitarian asylum to preserve her claim for such relief. Antonio v. Barr, 959 F.3d 778, 798 (6th Cir. 2020); Ordonez-Quino v. Holder, 760 F.3d 80, 95 (1st Cir. 2014). As those courts explained,

> because humanitarian asylum is 'not a separate form of relief created by the Immigration and Nationality Act,' but rather 'is a discretionary form of relief that may be granted to certain asylum seekers,' an applicant's eligibility for humanitarian asylum is not waived when she fails to independently request it on the basis of a past persecution claim.

---

race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.13(b)(1).

Antonio, 959 F.3d at 798 (quoting Ordonez-Quino, 760 F.3d at 95).  As further support for this conclusion, the Court of Appeals for the First Circuit noted that "there is no separate space in the asylum application, Form I-589, for an applicant to make a claim for 'humanitarian asylum,' as opposed to 'regular' asylum."  Ordonez-Quino, 760 F.3d at 95 n.13.[10]

We adopt the reasoning of our sister circuits and conclude that a noncitizen does not waive a request for humanitarian asylum where her asylum application asserts past persecution and provides facts showing compelling reasons for her being unable or unwilling to return to that country or that she would face other serious harm if removed.  B.L.L. has met these requirements.  Her asylum application alleged past persecution, see Zubeda v. Ashcroft, 333 F.3d 463, 472-73 (3d Cir. 2003) (explaining that rape "can constitute sufficient persecution to support a claim for asylum" and can even amount to torture) on account of her membership in a proposed PSG, and she submitted evidence that she suffers from PTSD and would be psychologically harmed if forced to return to the place where she was abused, thus plausibly providing a compelling reason for being unwilling to return.  The BIA thus erred in refusing to consider B.L.L.'s humanitarian asylum claim.

---

[10] Ordonez-Quino explained that an applicant is required to request humanitarian asylum "at the agency level—i.e., [either] before the BIA or IJ—prior to asking this court to review the agency's denial of such relief."  760 F.3d at 95 n.14 (emphasis in original).

We next consider whether the BIA erred in concluding that B.L.L. cannot establish humanitarian asylum because she failed to show she is a member of a PSG. A protected PSG is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." S.E.R.L. v. Att'y Gen., 894 F.3d 535, 540 (3d Cir. 2018) (quoting In re M-E-V-G-, 26 I. & N. Dec. 227, 237 (B.I.A. 2014)).[11]

The BIA rejected B.L.L.'s proposed PSG as a "member of the [L* D*] family" because it determined (1) the group lacks particularity, since it is "not limited to immediate family members[,] as it could include all family related by blood, in-laws, or other extended family members," AR 4; and (2) B.L.L. "provided insufficient evidence" to demonstrate that the group is socially distinct, AR 4-5.

The BIA erred in construing B.L.L.'s proposed group to include extended family. By defining the group as those who share B.L.L.'s surname (L* D*)—which is comprised of her father's paternal surname (L*) and her mother's paternal surname (D*)—B.L.L. limited the group to her immediate family, as her more distant relatives or in-laws would have a different set of surnames. Additionally, the relationship between B.L.L. and her persecutor is a parent-child relationship, which further supports interpreting the proposed

---

[11] We review "de novo the ultimate legal conclusion as to the existence of a particular social group, while we review the underlying factual findings for 'substantial evidence . . . .'" S.E.R.L., 894 F.3d at 543 (citation omitted).

PSG to cover only B.L.L.'s immediate family.[12]  The BIA's misunderstanding infected its particularity and social-distinction findings, so we cannot defer to them.  Accordingly, we remand to the BIA to determine whether B.L.L. has demonstrated that a group comprised of her immediate family satisfies the particularity and social distinction requirements.[13]  If those requirements are met, then the BIA should consider whether B.L.L. suffered persecution on account of her membership in that PSG. Though the IJ found no nexus linking her alleged persecution to her membership in that PSG, the BIA did not reach that issue, so we cannot uphold its decision on that ground. SEC v. Chenery Corp., 318 U.S. 80, 87–88 (1943).

---

[12] Moreover, B.L.L.'s memorandum of law to the IJ explained that "the cause of [B.L.L.'s] abuse is the fact that she was the child of her father and he had complete control over her."  AR 119.  B.L.L.'s memoranda before the IJ and the BIA also stated that "[B.L.L.], her siblings, and her mother were victims of severe physical domestic violence by her father[.]"  AR 14, 113.

[13] The BIA correctly rejected B.L.L.'s other two proposed PSGs—"child viewed as property of father" and "child without parental protection"—as too broad and amorphous. While youth can sometimes be an element of a cognizable PSG, see Lukwago v. Ashcroft, 329 F.3d 157, 178-79 (3d Cir. 2003) (upholding PSG defined as former child soldiers who escaped the Lord's Resistance Army), it becomes too vague when combined with additional amorphous elements, see Escobar v. Gonzales, 417 F.3d 363, 367-68 (3d Cir. 2005) (rejecting PSG defined as "Honduran street children" because "[p]overty, homelessness and youth are far too vague and all encompassing to be characteristics that set the perimeters for a protected group"); see also S.E.R.L., 894 F.3d at 556 (explaining that adding together characteristics "may well broaden, rather than narrow, a group"). Here, B.L.L. has failed to demonstrate that children who are "viewed as property of father" or "lack parental protection" are groups with discrete and definable boundaries or that they are socially distinct.

9

Our holding is narrow. We do not hold that families are always or ordinarily PSGs, only that they can be.  Nor do we hold that domestic violence automatically amounts to persecution.  Rather, we confine ourselves to passing on the agency's misunderstanding of B.L.L.'s PSG.

3

B.L.L.'s remaining arguments have no merit.  First, contrary to B.L.L.'s contention, the BIA did not conflate its PSG and nexus analysis.  Instead, the BIA did not reach the issue of nexus, as it concluded that B.L.L. had not articulated a cognizable PSG.[14]  Second, B.L.L. asserts that the BIA failed to cite evidence in the record, but the BIA cited to several excerpts of the hearing before the IJ and responded to B.L.L.'s arguments.  Sevoian v. Ashcroft, 290 F.3d 166, 178 (3d Cir. 2002) (explaining that the BIA "is not required to write an exegesis on every contention . . . but only to show that it has reviewed the record and grasped the movant's claims" (internal quotation marks omitted)).  Finally, B.L.L.'s argument that the BIA improperly applied "a more stringent standard to the concept of [PSG] than it does to other protected grounds," Pet. Br. at 38,

---

[14] In its past persecution analysis, the BIA determined that none of B.L.L.'s PSGs were cognizable and therefore did not discuss nexus.  Later in the opinion, in rejecting B.L.L.'s claim for humanitarian asylum, the BIA explained that "as discussed [], the respondent has not demonstrated past persecution on account of a protected ground."  AR 6.  B.L.L. appears to construe this latter statement as a determination as to nexus.  However, by referencing its earlier discussion, we read the BIA's statement as reiterating its finding that B.L.L. could not establish past persecution because none of her proposed PSGs were cognizable.

fails because <u>S.E.R.L.</u> requires use of the three-part framework that the BIA applied for determining the cognizability of a PSG. <u>See</u> 894 F.3d at 549-55 (concluding the BIA's three-part test is reasonable and entitled to <u>Chevron</u> deference).

III

For the foregoing reasons, we will grant B.L.L.'s petition for review and remand to the BIA.